**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**NEW ALBANY DIVISION**

| | |
|---|---|
| DIAMONO YONLI, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Case No. 4:24-cv-00059-TWP-KMB |
| | ) |
| SNYDER'S LANE, INC. | ) |
|   d/b/a CAMPBELLS SNACKS, | ) |
| | ) |
| Defendant. | ) |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on a Motion for Summary Judgment (Dkt. 34) filed by Defendant Snyder's-Lance, Inc.[1] ("Snyder's"). *Pro se* Plaintiff Diamono Yonli ("Yonli") initiated this action alleging violations of Title VII of the Civil Rights Act of 1964 and Americans with Disabilities Act of 1990 ("ADA") for failure to promote, national origin discrimination, failure to accommodate, and retaliation (Dkt. 1 at 2–4). For the reasons discussed below, Snyder's' request for summary judgment is **granted**.

### I.    LEGAL STANDARD

**A.   *Pro se* Pleadings**

Yonli is proceeding *pro se*. "A document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). The mandated liberal construction afforded to *pro se* pleadings:

> Means that if the court can reasonably read the pleadings to state a valid claim on which the [plaintiff] could prevail, it should do so despite the [plaintiff's] failure to

---

[1] Plaintiff has incorrectly named Defendant as "Snyder's, Inc. d/b/a Campbells Snacks", the Court refers to Defendant's correct name, Snyder's-Lance, Inc. (Dkt. 40 at 1).

> cite proper legal authority, his confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements.

*Harpel v. Ulrick*, No. 1:18-cv-320, 2020 WL 584615, at *1 (N.D. Ind. Feb. 6, 2020) (quoting *Hall v. Bellmon*, 935 F.2d 1106, 110 (10th Cir. 1991)). On the other hand, "a district court should not assume the role of advocate for the *pro se* litigant and may not rewrite a petition to include claims that were never presented." *Id*. (internal quotation marks and citation omitted). Moreover, although *pro se* filings are construed liberally, *pro se* litigants are not exempt from procedural rules. *See Pearle Vision*, 541 F.3d at 758; *see also Members*, 140 F.3d at 702. At the same time, the Seventh Circuit has explained that local rules—and instructions on how to comply with them—are "not intended to provide a maze of technical traps to complicate and delay litigation without advancing the merits." *Stevo v. Frasor*, 662 F.3d 880, 887 (7th Cir. 2011).

**B.**     **Summary Judgment Standard**

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular

2

issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

## II.    BACKGROUND

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Yonli as the non-moving party. *See Zerante v. DeLuca,* 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). However, the Court need not credit assertions that are contradicted by the record. *See Palmer v. Franz*, 928 F.3d 560, 563 (7th Cir. 2019) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.") (cleaned up).

As an initial matter, the Court notes that Yonli's summary judgment response brief (Dkt. 38) does not satisfy the requirements of Local Rule 56-1. His brief does not contain the required

"Statement of Material Facts in Dispute" section, and he does not indicate that he disputes any of the facts Snyder's puts forth.  In addition, Yonli fails to designate any evidence supporting his allegations, instead, he provides a two-page narrative of his allegations which includes conclusory legal assertions. *See id*. The Court recognizes that Yonli is self-represented and affords him appropriate deference.[2] However, the Court accepts Snyder's statement of material facts not in dispute for the purposes of its Motion, but the Court's standard for considering those facts remains in the light most favorable to Yonli.

### A.  Snyder's Hired Yonli as a Packer

Snyder's is a salty snack manufacturer that produces potato chips, pretzels, cookies, nuts, and other snacks under a diverse portfolio of recognizable snack brands including Campbell's Snacks (Dkt. 35-4 at 2). The Jeffersonville, Indiana plant manufactures, packages, ships, and receives Snyder's products. *Id*.

On February 25, 2022, Yonli, a Burkina Faso native, applied for a Packer position with Snyder's at its Jeffersonville, Indiana, plant (Dkt. 35-3 at 3). During his phone screening interview, he indicated he had prior experience operating machines and working in warehouses with Bosch, Amazon, and NYX (Dkt. 35-1 at 15–17 pp. 47:21–55:2). Snyder's hired Yonli as a Packer beginning on March 22, 2022, earning $18 per hour. *Id*. at 18 pp. 58:4–59:1. As a Packer, Yonli

---

[2] The Seventh Circuit has "repeatedly held that the district court is within its discretion to strictly enforce compliance with its local rules regarding summary-judgment motions." *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 360 (7th Cir. 2009); *see also Pearle Vision, Inc. v. Romm*, 541 F.3d 751, 758 (7th Cir. 2008). *Pro se* litigants are not exempt from compliance with these procedural rules. *Pearle Vision, Inc.*, 541 F.3d at 758; *Greer v. Bd. of Educ.*, 267 F.3d 723, 727 (7th Cir. 2001); *Members v. Paige*, 140 F.3d 699, 702 (7th Cir. 1998) (stating that procedural rules "apply to uncounseled litigants and must be enforced"). Courts liberally construe the pleadings of individuals that proceed *pro se*, but the Court is not required to search the record to support a *pro se* litigant's position. *Greer*, 267 F.3d at 727; *see* L.R. 56-1(h).

made product, prepared cartons for product packing, inspected final product before packing, bagged the product, and then boxed the bags for shipping. *Id*. at 18 pp. 58:10–15.

Yonli received an employee handbook, was aware of Snyder's discrimination, harassment, and retaliation prevention policy, and was aware of Snyder's policy concerning the accommodation requests for disabilities. *Id*. at 26–27 pp. 92:24–94:21.

### B.   Yonli Sought and Received a Promotion to Packaging Machine Operator

On June 24, 2022, Yonli applied for a promotion as a Packaging Machine Operator ("Operator") and was selected. *Id*. at 18 pp. 60:9–19. Yonli remained in the Operator role throughout his employment. (Dkt. 35-3 at 4).  As an Operator, Yonli was responsible for the continuous operation of the snack packaging machinery (Dkt. 35-1 at 18 pp. 60:20–61:13). This required him to monitor codes, dates, and prices, ensure all packaging materials were available for each machine, and adjust the controls as needed (Dkt. 35-4 at 4, 11).

Snyder's packaging machinery includes conveyors with moving or exposed parts, collapsing structures, and compressed equipment, which pose safety hazards if left unattended. *Id*. at 3. Accordingly, Snyder's expected all Operators to remain near their machines while in operation and to follow all safety procedures. *Id*. at 4.

Production associates such as Yonli work two types of shifts: a traditional work schedule (eight-hour shift) or an alternative work schedule (twelve-hour shift). *Id*. With the traditional schedule, employees receive two fifteen-minute breaks and one twenty-minute meal break, all paid. Yonli mainly worked on the alternative shift where he was provided the same two fifteen-minute breaks and one twenty-minute break, but also received an additional twenty-minute break. *Id*. Associates were not allowed to unilaterally schedule or extend their own breaks unless they obtained prior approval. *Id*. at 5. Operators are also prohibited from taking a break during their

shift's first or final hour. *Id*. Operators are also required to obtain approval from management before using the restroom. *Id*.

### C. <u>Yonli is Disciplined</u>

Yonli was disciplined four times during his employment. First, on June 7, 2022, after having been informally counseled about taking unauthorized breaks, Snyder's issued Yonli a First Written Warning for taking an unauthorized break without telling management. (Dkt. 35-3 at 6–7). Second, on October 22, 2022, Yonli was a Second Written Warning for running 296 cases of product with the incorrect code date. *Id*. at 7. Third, on April 1, 2023, leadership learned that Yonli had taken a break without prior approval in the final hour of his shift. Leadership counseled Yonli for this action, but despite this, Yonli repeated the same behavior the next day. Snyder's then issued Yonli a Final Written Warning. *Id*. Fourth, on August 9, 2023, production leadership observed Yonli take a break, exit the facility and go to his car where he continued his break for another forty minutes. On August 11, 2023, Snyder's issued Yonli a Second Written Warning to counsel him on the company's break time policies. The Second Written Warning was issued because his June 2022 First Written Warning had expired, moving him from a Final Written Warning back to a Second Written warning. *Id*. at 7–8.

### D. <u>Yonli Applies To Two Positions but is Not Chosen</u>

Yonli applied for a Materials Production Planner ("Planner") role on October 19, 2022. *Id*. at 4–5. The Planner is responsible for managing the inventory levels of raw materials used in production. The position required a minimum of five years production planning experience in a manufacturing environment or equivalent combination of education and experience. *Id*. Yonli did not have any production planning experience or education. *Id*. At his deposition, Yonli testified that he did not know what a production planner meant or did, and he could not recall having applied

6

for the position (Dkt. 35-1 at 37 pp. 134:4–135:22). Regardless, Yonli was not selected for this position.

On April 14, 2023, Yonli applied for a first shift Quality Assurance Technician ("QA Tech") position. *Id*. at 5–6. The job description for this position states that the QA Tech is responsible for performing analytical evaluations of raw ingredients in process and finished product, which involves continuously monitoring the process and product by various methods to maintain product consistency and comply with established specifications. (Dkt. 35-3 at 27). Snyder's sought a detail-oriented individual with chemistry and mathematical skills for this position. *Id*. Snyder's ultimately chose an internal candidate who was already working in the Quality Assurance department. (Dkt. 35-1 at 37).

On May 17, 2023, Snyder's had another QA Tech position opening on second shift. *Id*. at 6. Before opening the requisition to external applicants, Snyder's contacted Yonli and the other internal applicants who were not selected for the first shift position to see if they were interested. All of them—including Yonli—declined consideration for the second shift role. *Id*. Accordingly, Yonli was not selected.

### E.  Yonli Submits his First Complaint to the Indiana Civil Rights Commission

On September 5, 2023, Yonli filed a complaint with the Indiana Civil Rights Commission ("ICRC") and dual-filed with the Equal Employment Commission ("EEOC") (Dkt. 35-1 at 33–35, 37–39 pp. 120:12–127:9, 135:24–143:18). In his ICRC complaint, Yonli alleged that Snyder's discriminated against him based on his national origin and disability for the following reasons: (1) he applied to "numerous positions that [he] met the qualifications for and was never selected" and (2) on four occasions Snyder's enforced its policies and procedures with Yonli but not with other employees who purportedly engaged in similar conduct (Dkt. 35-2 at 10–11).

In his ICRC complaint, Yonli reported that Snyder's wrote him up for taking an unauthorized break on May 6, 2023, but Snyder's has no record of Yonli violating break rules on that date and no record of Yonli receiving any discipline on or around that date (Dkt. 35-3 at 8). Yonli also alleged that he "attempted to comply with workplace policy and have [his] machine shut down when [he] needed to step away from it" and that he informed his supervisor that he needed to step away from his machine due to a disability (Dkt. 35-1 at 37–38 pp. 136:13–138:25).

Snyder's designated evidence shows that in June 2023, Yonli had repeatedly left his workspace without authorization and without telling anyone (Dkt. 35-2 at 6–8). Yonli's supervisor counseled him regarding those instances, both informally and through formal written discipline. *Id*. At that time however, Snyder's attests that Yonli had not yet indicated that he had a disability. *Id*.

Yonli also alleged that he was required to work as a Packer while others were not. However, Snyder's asks Operators to work as Packers regularly to cover business needs (Dkt. 35-4 at 4). Yonli also challenged his Second Written Warning for taking excessive breaks alleging that his supervisor called him back even though he was on a scheduled work break (Dkt. 35-2 at 11). On that occasion, Yonli's supervisor called him back after twenty minutes—the allotted time—but Yonli did not return for an additional twenty minutes causing his break period to total forty minutes (Dkt. 35-3 at 7–8). This happened twice on August 9, 2023. *Id*.

### F.  Yonli is Disciplined Again, Requests an Accommodation and Files complaint

On October 18, 2023, Yonli left the three machines he was running without first notifying management. *Id*. at 20. Based on the prior coaching and written discipline Yonli had received, Snyder's prepared a Final Written Warning, dated October 18, 2023, and delivered it to Yonli on October 19, 2023. *Id*.

8

On October 23, 2023, because Snyder's had no knowledge concerning Yonli's disability prior to receiving his IRCR complaint, HR provided Yonli with a memorandum concerning his "Request for Accommodation," specifically asking for information about the nature of his medical condition, the medically necessary accommodation, and the records to support the same. *Id*. at 10. Snyder's then started investigating Yonli's internal complaint. *Id*.

While Snyder's waited for Yonli's accommodation form, Yonli took two additional extended breaks on October 28, 2023 (Dkt. 35-4 at 6). Due to this, Snyder's issued Yonli a Final Written Warning on November 7, 2023. *Id*. On November 8, 2023, Yonli provided Snyder's with a doctor's note which indicated his physician could not complete the accommodation paperwork until Yonli's pending medical results were returned. (Dkt. 35-1 at 12-13, 45). The accommodation paperwork raised a concern internally about discrimination and retaliation since August 5, 2023 (Dkt. 35-3 at 9, 40–42). Specifically, Yonli alleged that his manager forced him to perform non-Operator tasks and he was not being allowed to take his full break. *Id*.

On December 18, 2023, Snyder's received Yonli's completed accommodation form with an attached doctor's note stating in relevant part,

> Due to a medical condition, Mr. Yonli requires as needed bathroom breaks as well as one or two additional breaks depending on hours worked" –Yonli will require one break for an eight-hour shift or two breaks for a twelve-hour shift for medication administration related to his medical condition.

(Dkt. 35-2 at 25).

Snyder's believed their existing break policy covered Yonli's medical needs. So, on December 19, 2023, HR contacted Yonli's doctor to confirm that the existing number of breaks was sufficient, and no additional breaks were medically necessary. Yonli's provider assured them that the current break schedule was appropriate for Yonli's medical needs. HR then met with Yonli and explained this to him later that day (Dkt. 35-3 at 10–11). Yonli admitted he had been receiving

9

four to six breaks per shift and that he was able to take his medication during such breaks (Dkt. 35-1 at 44–45 pp. 165:14–166:5). Yonli nonetheless understood HR's conversation to mean that Snyder's had denied his accommodation request. *Id*. at 46 pp. 171:8–23.

Yonli then provided a second doctor's note to HR on January 2, 2024, asking Snyder's to consider allowing Yonli to take a fifteen-to-twenty-minute break so that his medication could be administered around his scheduled lunch time or midway through his shift. *Id*. at 47–48 pp. 177:19–178:13. HR met with Yonli on January 10, 2024, to explain that Snyder's break policy already provided Yonli with the breaks listed in the second doctor's note (Dkt. 35-3 at 11). Nevertheless, Snyder's offered Yonli an additional third, paid twenty-minute break every day to attend to his medical condition. *Id*.

On January 17, 2024, the ICRC issued a Notice of Finding concerning Yonli's complaint, concluding there was "no probable cause to believe an unlawful discriminatory practice occurred." (Dkt. 35-2 at 14–19).

### G. **Yonli Files Second Complaint with Indiana Civil Rights Commission**

That same day, January 17, 2024, Yonli initiated his second complaint of discrimination with the ICRC and the EEOC alleging that Snyder's retaliated against him for filing his September 5, 2023, ICRC complaint (Dkt. 35-2 at 27–28). The ICRC subsequently issued a Notice of Finding on March 6, 2024, and based on the records submitted and their final investigative report, there was "no probable cause to believe an unlawful discriminatory practice occurred" concerning the second ICRC complaint. *Id*. at 29–31.

**H.  This Action**

Yonli—while still employed with Snyder's—initiated this federal lawsuit on April 29, 2024, alleging employment discrimination and retaliation under Title VII and the ADA (Dkt. 1). His form Complaint alleges that Snyder's failed to promote him, failed to accommodate his disability, subjected him to unequal terms and conditions of employment, and retaliated against him based on his national origin (Burkina Faso) and disability (diabetes). *Id*. at 4. Yonli described the alleged discriminatory conduct as follows:

> From July 2022 until now, the company refused to promote me based on my national origin and disability. They (supervisor and manager) also, prevent me to use the restroom when I need too, and denied my accommodation as diabetes. (In June 25, 2023 and 12-19-24). In June 24, 2023, the supervisor allowed the breaker to break my coworkers with 40 mn [illegible] 5 breaks for 12 hours shifts and gave me 4 breaks with 20 mn. To retaliate me   on   December 19, 2023, the operation manager and HR reduced my break from 30 mn to 15   mn and 20 mn lunch.

*Id*. at 5.

### III.   DISCUSSION

Yonli asserts the following causes of action based on his national origin and disability: (1) failure to promote; (2) National origin discrimination through unequal terms and conditions of employment; (3) Failure to accommodate; and (4) Retaliation (Dkt. 1). The Court will provide a cursory overview of the legal principles applied to Yonli's claims before turning to the merits of each in turn.

Title VII prohibits employers from discriminating against their employees on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a). Likewise, the ADA prohibits employers from discriminating against a qualified individual on the basis of disability regarding discharge of employees or any other terms, conditions, and privileges of employment. *See* 42 U.S.C. § 12112(a). A plaintiff may prove discrimination under Title VII by using either the direct

11

method or the indirect, burden shifting method. *Stewart v. Henderson*, 207 F.3d 374, 376 (7th Cir. 2000). A plaintiff may prove discrimination under the ADA in the same manner. *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (7th Cir. 2001).

Regardless of how one chooses to proceed, at summary judgment, courts determining whether discrimination under Title VII or the ADA occurred ask whether the evidence "would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor [such as disability] caused the discharge or other adverse employment action." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016); *see also Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 504 (7th Cir. 2017) (stating that to survive summary judgment, "a plaintiff must show a genuine issue of material fact exists regarding whether his disability was the 'but for' reason for the adverse action[.]"). This evidence must be considered as a whole instead of asking whether any piece of evidence proves the claim by itself. *Ortiz*, 834 F.3d at 765.

Under the direct method, a plaintiff must offer direct or circumstantial evidence that supports an inference of intentional discrimination. Direct evidence requires "an admission of discriminatory intent." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 979 (7th Cir. 2014). A plaintiff may also prevail under the direct method by constructing a "convincing mosaic" of circumstantial evidence that "allows a jury to infer intentional discrimination by the decisionmaker." *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004). Circumstantial evidence can include suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group." *Alexander*, 739 F.3d at 979. The evidence "must point directly to a discriminatory reason for the employer's action . . . and be directly related to the employment decision." *Teruggi v. CIT Grp./Capital Fin., Inc.*, 709 F.3d 654, 660 (7th Cir. 2013).

Under the indirect method, courts utilize the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Courts employ this burden-shifting analysis as a means of "organizing, presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases." *David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). Under the familiar *McDonnell Douglas* burden-shifting method, a plaintiff must first prove: (1) that he is a member of a protected class; (2) he was meeting his employer's legitimate performance expectations; (3) he suffered an adverse employment action; and (4) other similarly situated employees who were not members of the protected class were treated more favorably. *Fane v. Locke Reynolds LLP*, 480 F.3d 534, 538 (7th Cir. 2007). If the plaintiff demonstrates these elements, "the burden shifts to the employer to come forward with a legitimate, nondiscriminatory reason for the challenged employment action." *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 500 (7th Cir. 2017). "If the employer does this, then the burden shifts back to the plaintiff to produce evidence establishing a genuine dispute of fact about whether the employer's reason was a pretext for discrimination." *Id.*

A.    **Failure to Promote**

Only one job application concerning Yonli's failure to promote claim falls within the 300-day EEOC limit: the April 14, 2023, application for the QA Tech role. Pursuant to Title VII and the ADA, an individual challenging a discrete employment act must initiate an EEOC charge of discrimination within 300 days of the allegedly unlawful act. *See Stepney v. Naperville Sch. Dist. 203*, 392 F.3d 236, 239 (7th Cir. 2004). Based on Yonli's September 5, 2023, ICRC complaint, any events occurring on or before November 9, 2022, are time-barred.

Yonli's October 19, 2022, application for the Planner position, which closed on November 3, 2022, is time-barred. Further, even if it was not, Yonli testified that he did not apply for this role

13

and does not even know what this role is or does (Dkt. 35-1 at 37 pp. 134:4–135:22). Accordingly, Yonli was not discriminated against by not being promoted to the Planner role.

Moreover, Snyder's could not have failed to promote Yonli to the QA Tech role based on his disability because Yonli did not inform Snyder's about his diabetes until June 25, 2023, which was two months after Yonli's application and after Snyder's decided to go with another candidate. An employer cannot discriminate against an employee for a disability they are unaware of at the time of the adverse action taken. If an employer is unaware of a disability, then the disability could not have been the "but for" cause of the alleged adverse action. *See Hedberg v. Indiana Bell Telephone Co., Inc.*, 47 F.3d 928, 932 (7th Cir. 1995) ("At the most basic level, it is intuitively clear when viewing the ADA's language in a straightforward manner that an employer cannot fire an employee 'because of' a disability unless it knows of the disability.").

This leaves only Yonli's claim that he was not promoted to the QA Tech position because of his national origin. To succeed on this claim, Yonli must produce evidence showing that: (1) he was a member of a protected class; (2) he was qualified for the position sought; (3) he was rejected for the position; and (4) Snyder's promoted someone outside of his protected class who was not better qualified for the position. *Riley v. Elkhart Cmty. Sch.*, 829 F.3d 886, 892 (7th Cir. 2016). Yonli's claim fails on the second and fourth element.

It is undisputed that Yonli is a member of a protected class; his national origin is Burkina Faso, and that he was rejected for the QA Tech position. Snyder's argues that Yonli has failed to produce any evidence to indicate that he was the best qualified candidate for the QA Tech role and that the person hired was not better qualified (Dkt. 36 at 23). Though Yonli need not prove he was the *best* candidate, the Court Agrees that Yonli has failed to show that he was qualified for the position.

Yonli merely states that he was qualified for the QA Tech position but does not explain his qualifications or provide any evidence concerning this claim. An employee's "own opinions about [his] qualifications do not give rise to a material factual dispute." *Robertson v. Wis. Dep't of Health Servs.*, 949 F.3d 371, 381 (7th Cir. 2020) (cleaned up). Snyder's selected an internal candidate with more tenure and who was already working in the QA Tech department.  Later, when a second shift QA Tech position opened up, Snyder's then offered Yonli a chance to interview for the QA Tech role on second shift, but he declined. Accordingly, no reasonable jury could conclude that Yonli was discriminated against by not being promoted to the QA Tech position and summary judgment is **granted** on this claim.

B.      **National Origin and Disability Discrimination**

The only direct evidence of national origin or disability discrimination that Yonli alludes to in his response brief is his hearsay statement that other Operators called him low IQ (Dkt. 38 at 2). But there is no evidence or affidavit corroborating this statement. In his form Complaint, Yonli checked the box stating that he was discriminated against by having "unequal terms and conditions of employment" (Dkt. 1 at 4). But Yonli fails to indicate what terms or conditions were unequal or provide any evidence establishing this assertion. Accordingly, Yonli's discrimination claims fail under the direct method.

Under the indirect method, Yonli must designate evidence to show: (1) that he is a member of a protected class; (2) he was meeting his employer's legitimate performance expectations; (3) he suffered an adverse employment action; and (4) other similarly situated employees who were not members of the protected class were treated more favorably. *Fane*, 480 F.3d at 538. Yonli's claims fail on elements two, three, and four.

First, Yonli cannot show that he was meeting his employer's legitimate performance expectations. Yonli consistently violated Snyder's work break rules and encountered performance challenges as well. He was counseled on various occasions including six separate written warnings—four of them concerning Yonli's violations of the break rules and two concerning performance issues such as running product with an incorrect code for an entire twelve-hour shift and abandoning his machine (Dkt. 35-2 at 6–9, 20–21; Dkt. 35-3 at 6–8; Dkt. 35-4 at 5–6).

Second, Yonli does not point to any adverse employment action sufficient to meet the standard. Adverse employment actions typically fall into one of three categories: (1) termination or reduction in compensation; (2) transfers or changes in job duties that "cause an employee's skills to atrophy and reduce further career prospects"; and (3) intolerable changes in job conditions, such as a hostile work environment. *Reives v. Ill. State Police*, 29 F.4th 887, 894 (7th Cir. 2022). Not every inconvenience will suffice to meet the adverse employment action standard; rather, the employee must show that "material harm has resulted from . . . the challenged actions." *Traylon v. Brown*, 295 F.3d 783, 788 (7th Cir. 2002) (omission in original) (citation omitted).

The written warnings alone do not rise to the level of an adverse employment action because there is no indication or allegation that they resulted in any material harm. *See Williams v. Help at Home, LLC*, No. 3:23-cv-2578, 2024 WL 1701854, at *4 (S.D. Ill. April 19, 2024); *see also Burrell v. United Parcel Service, Inc.*, 163 F. Supp. 3d 509, 526 (N.D. Ill. Feb. 16, 2016) (finding that a write-up was not an adverse employment action because the warning did not result in any change in employment). While the written warnings "are putatively disciplinary measures, none resulted in tangible job consequences and therefore are not adverse employment actions actionable under Title VII." *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 648 (7th Cir. 2005) (citing

16

*Longstreet v. Ill. Dep't of Correction*, 276 F.3d 379, 384 (7th Cir. 2002) and *Oest v. Ill. Dep't of Corrections*, 240 F.3d 605, 613 (7th Cir. 2001)) (internal quotation marks omitted).

Yonli fails to provide any evidence that the written warnings resulted in material harm and thus, he did not experience an adverse employment action. *See Sweeney v. W*, 149 F.3d 550, 556 (7th Cir. 1998) ("Absent some tangible job consequence accompanying those reprimands, we decline to broaden the definition of adverse employment action to include them.").

Yonli alleges that being temporarily assigned packing duties while being an Operator is an adverse employment action. But, as with the written warnings, he provides no indication of how such temporary assignment harmed him. Accordingly, Yonli has failed to meet his burden of showing that a temporary assignment of packing duties is a materially adverse employment action because he failed to explain how such change affected the "terms, conditions or privileges of employment." *See* 42 U.S.C. § 2000e-2(a)(1).

Third, Yonli states in his response that other Operators were given breaks of thirty to fifty-five minutes while he only got twenty-minute breaks. However, Yonli provides no evidence of this, and the record does not indicate that any other Operator received longer breaks than Yonli; rather, the record indicates that Snyder's enforced the policies uniformly (Dkt. 35-3 at 9, 39).

Because Yonli's claims of discrimination based on national origin and disability fail on the direct method and fail on three of the four necessary elements under the indirect method, no reasonable jury could conclude that Snyder's discriminated against him on the basis of his national origin or disability.

Finally, as required by *Ortiz*, the Court looks at the evidence as a whole and finds that no reasonable jury could conclude that Yonli was discriminated against because of his national origin or disability and summary judgment is **granted** for these claims.

C.        **Failure to Accommodate**

To prove his failure to accommodate claim, Yonli must show that: "(1) plaintiff was a qualified individual with a disability; (2) defendant was aware of his disability; and (3) defendant failed to accommodate the disability reasonably." *Scheidler v. Indiana*, 914 F.3d 535, 540–41 (7th Cir. 2019). However, "it is the employer's prerogative to choose a reasonable accommodation; an employer is not required to provide the particular accommodation that an employee requests." *Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 961 (7th Cir. 2021). Whether Yonli "wants more or different accommodations does not make what he did receive unreasonable." *Id*. at 962.

Yonli admitted in his deposition that the break time at issue in his doctor's notes—approximately fifteen to twenty minutes—equated to the breaks he was already receiving (Dkt. 35-1 at 47–48 pp. 181:20–182:10). This is confirmed by Snyder's evidence which shows that HR called Yonli's doctor to see if their current break schedule properly accommodated Yonli's medical condition; and Yonli's doctor believed it did (Dkt. 35-3 at 10–11). Also, Snyder's provided Yonli an additional twenty-minute break to administer his medication, (Dkt. 35-3 at 11)—a timeframe Yonli's doctor believed was sufficient for him to administer his medication.

Yonli has failed to articulate or provide any evidence as to why this additional twenty-minute break was insufficient to accommodate his medical condition. Accordingly, because Yonli's doctor both confirmed that his existing break schedule was a sufficient accommodation and Snyder's nonetheless provided Yonli an additional twenty-minute break to administer his insulin, the Court concludes that no reasonable jury could find that Snyder's failed to accommodate Yonli's disability and summary judgment is **granted** on this claim.

18

**D.**    **Retaliation**

For Yonli to succeed on his retaliation claims, either under Title VII or the ADA, he must first establish that he (1) engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) a causal connection exists between the two. *See Scheidler*, 914 F.3d at 544 (affirming summary judgment for employer on ADA retaliation claim); *see also Lesiv v. Illinois Cent. R. R. Co.*, 39 F.4th 903, 911 (7th Cir. 2022) (affirming summary judgment for employer on Title VII retaliation claim). Yonli's retaliation claims fail for the same reasons his discrimination claims failed above—he did not suffer an adverse employment action.

While it is undisputed that Yonli engaged in a statutorily protected activity by filing his complaints with the ICRC and EEOC, the Court concluded above that Yonli did not suffer an adverse employment action and does so again here for the same reasons. Further, there can be no causal connection between a statutorily protected activity and an adverse employment action if there is no adverse employment action to begin with. Accordingly, Yonli's retaliation claims also fail and summary judgment is **granted** on this claim.

## IV.    CONCLUSION

For the reasons discussed above, Snyder's Motion for Summary Judgment (Dkt. 34) is **GRANTED**. Yonli's claims for failure to promote, failure to accommodate, discrimination, and retaliation under Title VII and the ADA are all **dismissed with prejudice**.

Final judgment shall issue separately.

**SO ORDERED**.

Date:    3/23/2026

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

19

Distribution:

DIAMONO YONLI
3004 Beech Grove
Court #7
Jeffersonville, IN 47130

Christina M. Mallatt
Ogletree Deakins
christina.mallatt@ogletree.com

Kate Elizabeth Trinkle
Ogletree Deakins
kate.trinkle@ogletreedeakins.com